# UNITED STATES DISTRICT COURT
## EASTERN DISCRICT OF MICHIGAN
### SOUTHERN DIVISION

ALIYAH WILSON,

        Plaintiff,

vs.

FORD MOTOR COMPANY, BRIAN WATKINS,
DONALD WIGGINS, ROBERT FRAOGOS, A. SLOAN,
JIMMY WILLIAMS, SHERRY SWEET, WISSAM (SAM) FARAJ,
GABRIEL GREEN, BRITTANY PRYOR, BRYANT WATKINS,
KEVIN CAMM, ROLANDO KENNEDY, ANDREW ROBICHAUD,
KEVIN DRAGER and SAMANTHA B.,
*(Jointly, severally and in their individual capacities)*

        Defendants.

_____

**HALL MAKLED, P.C.**
Cyril C. Hall (P29121)
Lamont D. Satchel (P52647)
Amir Makled (P76306)
Attorneys for Plaintiff
23756 Michigan Avenue, Ste. 300
Dearborn, Michigan 48124
(313) 788-8888 (Office)
(313) 582-7962 (Fax)
cyrilhalllaw@sbcglobal.net
satchel@hallmakled.com
amakled@hallmakled.com

_____

## COMPLAINT AND JURY DEMAND

## PARTIES

1. Plaintiff, Aliyah Wilson, is an African American woman, who is a resident of the City of Dearborn, County of Wayne, State of Michigan.

2. At all relevant times Plaintiff was employed as a Production Line Worker at Ford Motor Company's Rouge Plant.

3. Plaintiff began her employment with Defendant Ford in or around June 2017.

4. Defendant, Ford Motor Company, is a corporation, with its principal place of business and headquarters in Dearborn, Michigan.

5. Defendant Brian Watkins, Supervisor, at all relevant times, was an employee of Ford Motor Company.

6. Defendant Donald Wiggins, Supervisor, at all relevant times and currently, is an employee of Ford Motor Company.

7. Defendant Bob Fraogos, Superintendent, at all relevant times and currently, is an employee of Ford Motor Company.

8. Defendant Jimmy Williams, former Supervisor, at all relevant times and was an employee of Ford Motor Company.

9. Defendant Sherry Sweet, Supervisor, at all relevant times and currently, is as an employee of Ford Motor Company.

10. Defendant Wissam (Sam) Faraj, Supervisor, at all relevant times and currently, is as an employee of Ford Motor Company.

11. Defendant Gabriel Green, Supervisor, at all relevant times and currently, is as an employee of Ford Motor Company.

12. Defendant Brittany Pryor, Supervisor, at all relevant times and currently, is as an employee of Ford Motor Company.

13. Defendant Bryant Watkins, Back-up Team Lead, at all relevant times and currently, is as an employee of Ford Motor Company.

14. Defendant, Kevin Camm, Line 3Team Lead, at all relevant times and currently, is as an employee of Ford Motor Company.

15. Defendant Rolando Kennedy, Acting Team Lead, at all relevant times and currently, is as an employee of Ford Motor Company.

16. Defendant Andrew Robichaud, Former Team Lead, at all relevant times was an employee of Ford Motor Company.

17. Defendant A. Sloan, TPT Production Line Worker, at all relevant times and currently, is as an employee of Ford Motor Company.

18. Defendant Samantha B, Human Resources Representative, at all relevant times and currently, is an employee of Ford Motor Company.

19. Defendant Kevin Drager, at all relevant times and currently, is an employee of Ford Motor Company.

## JURISDICTION AND VENUE

20. This is an action to enforce civil rights arising out of Plaintiff's employment relationship with Defendant, pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 USC 2000e et seq.

21. This is an action to enforce civil rights arising out of Plaintiff's employment relationship with Defendant Ford, pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978.

22. This court has jurisdiction pursuant to 42 USC 2000e-5 and 28 USC § 1331, 1343(a)(4).

23. The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the Eastern District of Michigan, Southern Division.

24. This court has pendent jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

## COMMON ALLEGATIONS

25. Plaintiff incorporates the preceding paragraphs as fully set forth herein.

26. Plaintiff began her employment with Ford Motor Company on or about July 2017 as a Temporary Part-Time Production Line Worker.

27. Plaintiff job consisted of supporting production line function, duties and responsibilities.

28. In 2017 Plaintiff became pregnant and provided Defendant Ford Motor Company's Human Resources and Medical units with written restrictions in October of 2017.

29. The restriction included no lifting over 10 lbs or strenuous bending.

30. Rather than accommodate Plaintiff, Defendant Ford Motor Company informed Plaintiff that they could not accommodate her, without making an assessment as to her requested accommodation under applicable state and federal law.

31. Plaintiff's request for accommodation was denied and she was told to either quit her employment or take a leave of absence.

32. One week after Defendants failed to accommodate Plaintiff, and as a result of their failure to accommodate her, Plaintiff experienced serious contractions and other physical symptoms while doing her assigned job.

33. Plaintiff gave Defendants another medical restriction related to abdominal problems resulting from Defendant Ford's failure to provide the prior requested accommodation.

34. Plaintiff request for accommodation was denied and she was told to either quit her employment or take a leave of absence.

35. Plaintiff was on maternity leave from November 2017 to June 2018.

36. On or about June 2018 Plaintiff attempted to return to work after her successful pregnancy.

37. Upon return to work, Plaintiff provided Defendant Ford's medical unit with the required work clearance paperwork. However, Defendant Samantha B, improperly reviewed the paperwork and denied it as insufficient, requiring Plaintiff to provide paperwork stating: (1) she had a "living child"; (2) date of delivery; (3) date of expected delivery.

38. Defendant Samantha B' actions were in violation of Plaintiff's HIPPA rights and her federal and state Civil Rights.

39. Plaintiff complied with Defendant Samantha B's illegal request and provided the new paperwork to the medical unit and was told by the medical unit she was already cleared to work, and not to give the new paperwork to Defendant Samantha B.

40. In or about July 2018 Plaintiff informed her union representative Shamar Clemons that she needed an accommodation for breast pumping and was told by him to let her team leader, Andrew Robichaud, know of her request, which Plaintiff did.

41. Plaintiff was given an accommodation to breast pump twice a day, before and after lunch.

42. However, Plaintiff's accommodation was denied on multiple occasions and she was ridiculed for exercising her accommodation.

43. Defendant Andrew Robichaud, in or about July 2018, refused to allow Plaintiff to breast pump, making condescending and degrading comments to her regarding breast pumping. On one occasion, when Plaintiff requested to take the agreed upon break to breast pump, Defendant Andrew Robichaud denied her stating, "You are going to have to leak on your line". Moreover, he also denied her claiming that his production line would have to go down and he would not allow that to happen just so that Plaintiff could breast pump.

44. In the ensuing days and weeks, Defendant Andrew Robichaud continued to ridicule, taunt, harass, and embarrass Plaintiff over breast pumping, remarking on one occasion, "I could make a loud noise and your breast will leak". He then hollered loudly in front of her and their colleagues, "Was her breast running?"

45. Defendant Andrew Robichaud engaged in other conduct that was discriminatory, harassing and retaliatory in relationship to Plaintiff breast pumping, including, but not limited to:

   a. Expressing to Plaintiff that he did not like her breast pumping because it caused him to have to work on the line;

b. Accusing Plaintiff of taking too long to breast pumping without inquiring as to the nature and particulars involved in having to breast pump; and

c. Delaying providing Plaintiff her accommodation of breast pumping;

46. Defendant Andrew Robichaud's conduct facilitated and encouraged others to harass, discriminate, retaliate and ridicule Plaintiff regarding breast pumping.

47. As a result of the harassing, discriminatory, retaliatory and improper conduct of Defendants, 12 ounces of Plaintiff's breast milk, which she stored in the company refrigerator, was stolen. When Plaintiff alerted her union representative, Shamar Clemons, he directed her to start leaving her breast milk in the union office, so as to avoid the harassing, discriminatory and retaliatory treatment of Defendants.

48. Defendant Rolando Kennedy discriminated harassed and retaliated against Defendant by docking her pay whenever she exercised her breast pumping accommodation and threatening to do so when she insisted on breast pumping.

49. Defendant Rolando Kennedy discriminated, harassed and retaliated against Defendant by refusing to allow her to breast pump; making it inconvenient

for her to breast pump; and intentionally disregarding and ignoring her express requests to breast pump.

50. On or about the week of August 2018, Plaintiff alerted Defendant Rolando Kennedy that she desperately needed to breast pump. Defendant Kennedy conditioned exercise of her breast pumping accommodation on sexual favors, loudly stating. "I'll let you off the line if you give me some titty milk!" Plaintiff was in shock and disbelief over this statement, when Defendant Kennedy walked up to her and then said "Are you going to let me suck on your titties?" Plaintiff rejected Defendant Kennedy's aggressive sexual assault and sexual harassment, but Defendant did not relent. Instead he stared at Plaintiff waiting for her to concede to his sexual overtures.

51. Defendant Kennedy left once Plaintiff did not accede to his sexual demand and returned approximately 10 minutes later and allowed her to go on her much needed breast pump break and continued his sexual assault and sexual harassment telling Plaintiff, "I'm a big boy. I need my milk."

52. Defendant Rolando Kennedy persistently harassed discriminated and retaliated against Plaintiff related to her attempt to make use of her breast pumping accommodation.

53. On or about September 4, 2018 Plaintiff was alerted by a co-worker, Jocia, that Defendant Andrew Robichaud, was threatening to stop her pay while

she was breast pumping and warned her to be careful because Defendants were "trying to get her fired."

54. On or about the week of September 21, 2018, after Plaintiff came back from breast pumping, Defendant Kennedy penalized her by dismissing her from her work assignment and sending her to see Defendant Brittany Pryor.

55. Defendant Pryor, in the presence of Plaintiff' alternative union representative, accused Plaintiff of taking an excessive amount of time breast pumping, stating that it should only take 15 minutes per breast.

56. Plaintiff reminded Defendant Pryor that the breast pumping accommodation was 30 minutes per breast. Pryor feigned lack of knowledge and apologized to Plaintiff.

57. Defendant Pryor, in the presence of the Plaintiff's alternative union representative, assured her not to worry going forward and that she would take care of making sure she received the agreed upon breast pumping accommodation time of 30 minutes per breast.

58. Upon Plaintiff's return from Defendant Pryor she encountered Defendant Bryant Watkins, Defendant Kennedy and Defendant Sharina Davis, who verbally harassed her sexually. Defendant Sharina Davis stated: "We know what's taking you so long [to breast pump]. I told them [co-workers] you have to get milk from your stomach because you have no titties." The

aforementioned Defendants laughed at the comment and Defendant Kennedy repeated these words to Plaintiff. Defendant Bryant Watkins, then commented that "she has little titties."

59. Due to the hostile work environment created by Defendants, Plaintiff's co-workers vocally moo like a cow and make cow-like sounds in her presence.

60. In retaliation and further harassment of Plaintiff, Defendant Supervisors and Team Leaders improperly transferred her to another production line for one week to avoid having to provide her breast pumping accommodation.

61. Defendants attempted to place Plaintiff on Defendant Green's production line. Defendant Green was ordered to take her on his line and refused to take her stating "no, she has that milk thing going on" and walked off.

62. Defendant Green had another woman on his line who was breast pumping and didn't want another woman pumping.

63. Plaintiff was then made to sit idle for three hours and was then dismissed to go home, with no pay for the day.

64. Before being dismissed for the day with no pay, Plaintiff offered to drive the F150 Trucks, which was a job that was always in demand. The Ford Supervisor declined claiming that since she was a Temporary Part-Time employee (TPT) she was precluded from doing this job.

65. Plaintiff had been allowed to do this job in the then recent past and when she was originally hired.

66. In the ensuing weeks Plaintiff would report to work daily and was told to report to the front desk. After reporting to the front desk Plaintiff would be told there was no work and sent home, instead of allowing her to work on her assigned production line.

67. When Plaintiff was eventually allowed to work, instead of allowing her to work on her assigned production line, she was placed on Production Line 3, which was commonly known as the "punishment line". The work on Production Line 3 is more difficult.

68. Defendants refused and failed to properly train Plaintiff on executing the duties and job function of Production Line 3.

69. Defendants failed and refused to give Plaintiff the necessary equipment to perform the job, including, but not limited to, an impact glove which she requested, resulting in physical injury to Plaintiff's hand.

70. Plaintiff requested an impact glove along with her tag relief who trained her and was told there were none available and that she would have to work without this essential piece of safety equipment.

71. Defendant Bob Fraogos, directed that Plaintiff be removed from the Production Line, while he verbally berated her as being "dumb". This was

done in the presence of Shamar Clemons, Defendant Kevin Camm and Sherina Davis.

72. Plaintiff's hand became swollen and blistered and she was sent to Defendant Ford's medical unit, which wrapped her wrist, provided a brace for her hand and blister cream. The medical unit put Plaintiff on job restrictions, including no use of her right hand and required Defendant to provide her an impact glove is she was assigned to Production Line 3.

73. Plaintiff provided her restriction to Defendant Kevin Camm who then shouted to her, "You can get the fuck off my line! You can't do nothing for me so you can get the fuck on!" Plaintiff was left to sweep with her left hand for the remainder of the shift.

74. Defendants in retaliation and discrimination provided her with a left hand glove, where she was right-handed.

75. It was determined by Defendant that they failed to provide Plaintiff the JDS sheet which described the health and safety protocol for working on Production Line 3 and included the requirement of wearing impact gloves.

76. While working on Line 3, Team Lead, Defendant Kevin Camm denied her request to breast pump.

77. When Plaintiff was returned to her regular assignment, instead of allowing her to pump as agreed, she was given a medical pass by Defendant Jimmy Williams when she requested to breast pump.

78. Medical passes are given to allow employees to go to the medical unit to deal with medical issues and not for breast pumping.

79. Plaintiff went to the medical unit as directed by Defendant Jimmy Williams.

80. The medical unit refused to take the medical pass or sign it and informed Plaintiff that Defendants repeated actions toward her were improper and that she should consult an attorney.

81. The medical unit informed Plaintiff that Defendants are not allowed to put time restrictions on breast pumping and told Plaintiff to have her Supervisor and/or Team Lead call the medical unit so that they could edify them regarding the rules and law related to allowing Plaintiff to breast pump.

82. Plaintiff returned to her work location and informed Defendant Jimmy Williams that the medical unit requested that he call them and that it was improper for him to give her medical passes for breast pumping or place time restrictions on breast pumping.

83. Defendant Jimmy Williams responded he was not going to call the medical unit.

84. Defendant Jimmy Williams never contacted the medical unit as requested.

85. Defendant Jimmy Williams continued over the next several days giving Plaintiff medical passes when she requested to breast pump, forcing her to go to the medical unit.

86. The medical unit continued to decline to accept and sign the medical passes and insisted that it was improper to issue a medical pass for breast pumping.

87. Defendant did not stop this conduct of forcing Plaintiff to go to medical unit when she requested time to breast pump until Plaintiff's union complained to the onsite labor relations department.

88. Due to the abusive, retaliatory, discriminatory, reckless and harassing behavior of Defendants, Plaintiff experienced an anxiety attack on or about August 23, 2018 and was admitted into the hospital.

89. When Plaintiff returned to work on or after August 29, 2018, Defendant Andrew Robichaud attempted to convince her to leave work and Plaintiff refused.

90. Upon return Plaintiff was again sexually harassed, discriminated and retaliated against by Defendants. Defendant Sloan stated to her in the company of Defendant Kennedy and Defendant Brian Watkins that the reason Plaintiff takes so long pumping is because she is "playing with her pussy". Defendant Kennedy responded, "we can help you with that". Defendant Brian Watkins then responded, "That's what she needs. That's

why she acts like that".  All three Defendants then began to laugh at Plaintiff.

91. After this incident Plaintiff was forced to take the day off because she felt an anxiety attack coming on and later that day she was admitted to the hospital and diagnosed with having an anxiety attack and a seizure.

92. Plaintiff experience several episodes of seizures and anxiety attacks as a result of Defendants conduct, prior to returning to work on or after August 28, 2018.

93. After Plaintiff returned to work, Defendant Brian Watkins, in the presence of Defendants Kennedy and Defendant Sloan, told Plaintiff, "You were off because you got some good dick."

94. Plaintiff tried to ignore the sexually assaultive and harassing comments by putting on her headphones and after approximately an hour into her shift the pressure caused her to share the harassment with her union representative, Shamar Clemons.

95. Shamar Clemons sent her to medical.

96. Plaintiff was placed on medication for her anxiety induced seizures.

97. On or about September 7, 2018, two hours into her shift, Defendant Kennedy told Plaintiff to get off the line because he was giving someone else her job and sent her home.

98. Defendant Kennedy gave her job to a fellow male employee, with less seniority, named Derek.

99. On or about September 8, 2018 rather than allow Plaintiff to report to her assigned job, Defendant Kennedy ordered her to report to the supervisor's desk because he did not need her on her assigned job. When Plaintiff complained of his conduct to Defendant Brittany Pryor, she sided with Defendant Kennedy that no work was available, and she should go home. Plaintiff then confronted Defendant Brittany Pryor with the fact that she was guaranteed 3 days of work and refused to be bullied and sexually harassed into repeatedly being sent home for lack of work when work was clearly available.

100. Defendant Brittany Pryor relented and placed Plaintiff her on team other than Defendant Kennedy's. However, approximately three hours into her shift, Defendant Kennedy singled her out and directed her to go home, which Defendant Brittany Pryor endorsed.

101. On Saturday, September 9, 2018, Plaintiff worked a full shift and was not paid. Plaintiff's Team Lead for that day remarked to her, "You're the girl who has to do the pumping thing." Further, when Plaintiff requested to breast pump she was not allowed to at the time of the request. Instead, the Team Lead walked off and ignored her request, only to return 1 hour later

and let her go.  She was relieved by Jeremiah, who was Team Lead for another production line.

102.     On or about September 11, 2018 Defendant directed Plaintiff to report to the supervisor's desk instead of her appointed work location and stated that she is to always report to the supervisor desk, unlike other similarly situated employees.

103.     On or about September 11, 2018, Defendant Brittany Pryor, forced Plaintiff to tell Defendant Kennedy that he was not "going to have problems out of her today", as it related to breast pumping and otherwise.

104.     On or about September 11, 2018, when Plaintiff returned from breast pumping, Defendant Sloan asked her "Where is my titty milk?"

105.     On or about September 12, 2018, Defendants Kennedy and Brittany Pryor, continued to harass, retaliate and discriminate against Plaintiff.  Upon arrival at work Plaintiff was ordered by Defendant Kennedy to report to the supervisor desk, instead of to her assigned job. The supervisor's desk personnel directed her to go to her assigned job, as appropriate.  However, three to five minutes into the job, Defendant Kennedy pulled Plaintiff off the job and directed her to report to the job location she worked the day before. After an hour into that job, Defendant Kennedy again pull her off the job and ordered her to go sit at the supervisor's desk.  A half an hour later he

appeared and directed her to report to the job he had pulled her from earlier. After 1-2 hours into that job, Defendant Kennedy then pulled her from the job and ordered her to sit at the supervisor's desk. Defendant Brittany Pryor then ordered her to cover another employee's job.

106. Defendant Kennedy then approached Plaintiff in an attempt to intimidate, retaliate and discriminate against Plaintiff and informed her he was "bumping" her back to a three day or less work schedule and ordered her to pick the day she wanted off. Plaintiff chose Friday and Defendant Kennedy denied her selection, then told her she could only choose Wednesday or Thursday. It was only with the intervention of Plaintiff's Union Representative Shamar Clemens that she able to secure her selection of Friday.

107. On or about September 13, 2018, upon arrival at work, Plaintiff was forced by Defendant Brian Watkins to report to the supervisor's desk, while a male employee, Derek, performed her work. Defendant Kennedy informed Defendant Brian Watkins that he did not want Plaintiff on his production line, which was her assignment, and she was taken to a different production line. The Supervisor of that line, indicated that he could use her on his line, but the Team Lead, gestured and stated he did not want her on that production line because "she has to do that pump thing".

108.    After Plaintiff came back from breast pumping the Team Lead refused to let her do the job and nudged her away from the job site. After approximately 30 minutes, the Team Lead allowed her to continue doing the job and remarked to a fellow male employee, "We have these princesses who act like they have medical issues!"

109.    Since Plaintiff's return to work after her pregnancy Defendants, including Defendants Kennedy, Supervisory Defendants, ordered her to report to the supervisor's desk upon arrival at work, then ordered her to go home claiming there was no work for her, despite the fact that there was available work.

110.    On several occasion Plaintiff challenged Defendants claim that there was no work and Defendants relented and allowed her to work various jobs.

111.    After Plaintiff complained about her treatment by Defendants when she tried to exercise her accommodation for breast pumping, Defendant Ford Motor Company sent a memorandum to employees, including individual Defendant Supervisors and Superintendents referenced herein, confirming the right of employees to breast pump. However, the discrimination and harassment continued.

112.    Defendant Brian Watkins, Supervisor, confronted Plaintiff and stated that he attributed the reason for the communication regarding breast

pumping to email to Plaintiff and then started making her report to the supervisor desk every day, instead of to her regular assignment.

113.     In addition, Defendant Brian Watkins shuffled Plaintiff between different job areas all the while informing each location supervisor of Plaintiff's need to breast pump, and when they rejected her because of her need to breast pump, Plaintiff was sent home for lack of work.

114.     In the presence of Plaintiff, and others, Defendant Brian Watkins said over the radio to other employees, including Defendant Sherry Sweet that he did not want Plaintiff working in his area and Defendant Sweet said she didn't want her either.  Plaintiff was shopped around to different work locations then sent home because no one wanted her due to her need to breast pump.

115.     After distribution of the above-referenced memorandum, Defendant Brian Watkins, Supervisor, directed that Plaintiff be taken off of the production line.

116.     Defendant Brian Watkins would have Plaintiff report to the supervisor's desk while he placed other workers on jobs that Plaintiff was eligible to do and had done in the recent past, thereby making her excess and sending her home for lack of work.  Defendant Brian Watkins did this on numerous occasions.

117.     Antagonistic to Plaintiff's right to breast pump and in utter disregard of the company memorandum regarding breast pumping which he was aware of, Defendant Brian Watkins informed Plaintiff that if she wanted to breast pump he was going to send her home.

118.     Defendant Brian Watkins assigned and escorted Plaintiff to the production line supervised by Defendant Wissam (Sam) Faraj.  When Plaintiff indicated she needed to breast pump Defendant Faraj told Plaintiff that she was not allowed to breast pump.  When Plaintiff told Defendant Jimmy Williams that her union knew about this, Defendant Williams improperly tried to give her a medical pass then wrote her up because she would not take the inappropriate pass.   Under fear of reprisal, Plaintiff took the illegitimate and improper medical pass and went to the medical office and Sahai Thomas-Fenson tore up pass and called Defendant Williams and told him he had no right to deny her right to breast pump or send her to medical.

119.     After distribution of the memorandum, Defendants' harassment, retaliation and discriminatory conduct toward Plaintiff increased and continued up to and culminated in her illegal termination.

120.     Defendants deliberately and continuously attempted to injure, maim or otherwise cause harm to Plaintiff.

121.     On or about September 23, 2018 Superintendent Michael

Metapedican, directed Defendant Brian Watkins not to assign Plaintiff to

drive production vehicles because she was not qualified to do so.  Plaintiff

was present when the directive was given.  Nevertheless, Defendant Brian

Watkins disregarded the directive and ordered Plaintiff to drive a production

vehicle truck that he knew or should have known to be defective, causing

physical, mental and emotional damage to Plaintiff.

122.     As a result of being improperly directed to drive the vehicle, Plaintiff

sustained physical, emotional and mental injuries when vehicle crashed due

to a vehicle defect.

123.     Defendants failed to follow proper protocol to ascertain the cause of

the crash, including, but not limited to, preparing an investigation report by

their health and safety division/unit and failing to drug test Plaintiff as

required by company policy and relevant law.

124.     Defendants claimed the accident was the result of air bubbles in the

brake line.

125.     Defendants embarrassed and humiliated Plaintiff, telling her that Ford

Motor Company was fortunate that she crashed and was injured due to the

defective brakes, as opposed to the customer, who could have died or been

seriously injured and sued Defendant Ford Motor Company.

126.     After the accident Defendant informed and directed Plaintiff that she was not allowed to follow up with her own physician and health care providers in an apparent attempt to cover up their actions surrounding the crash and Plaintiff's resulting injuries.

127.     After the accident, Plaintiff was off from on or about October 17, 2018 to approximately November 12, 2018. When she returned she went directly to the C Crew work station, where she was assigned.  However, Defendants' computer assignment tracking system kept her on B Crew, where she no longer was assigned, causing Plaintiff to accumulate AWOL designations which Defendant attempted and/or will attempt to use to terminate her employment.

128.     Plaintiff continued to receive verbal abuse, retaliation and discrimination from Defendants when Defendant Bob Fraogos, Superintendent, told her to "get the fuck off his crew" in front of several people on our about Saturday, November 24, 2018

129.     Further, Defendant Bob Fraogos directed Defendant Michael Metapedican not to allow Plaintiff to work and to send her home, despite that fact that Plaintiff was capable, eligible and willinging to work and work was available. In fact, Defendant Fraogos told Defendant Metapedican "whatever you have to do, don't work her," despite the fact that Plaintiff was

assigned to C crew and it was confirmed on the company computer, which she witnessed.

130.     When Plaintiff challenged the retaliatory, discriminatory and reckless conduct of Defendants, informing Defendant Metapedican that she was properly assigned to work and that it was improper for him to deny her work under the circumstance, he promptly informed her that he did have the authority to deny her the opportunity to work and that he had "heard about you", alluding to the Complaint (Internal Complaint) she filed against several Defendants.

131.     After Plaintiff filed her Internal Complaint regarding her treatment by Defendants, on or about October 11, 2018, Monty Walls, her Union Representative warned her that she was about to "endure hell" from the company through the concerted activity of management and fellow employees because of the complaint she filed. He informed and warned her that Defendants were trying to get rid of her.

132.     Plaintiffs' Internal Complaint was not properly or fully investigated and was prematurely dismissed without reason or justification. In fact, Human Resources dismissed the investigation and complaint without a hearing.

133.    Based on information and belief Defendant Brianna Krus and Defendant Kevin Drager were directed to drop the investigation by more senior Ford Motor Company officials.

134.    As a result of Defendants' conduct, behavior and treatment toward Plaintiff, she was no longer able to breast feed her daughter due to her breast milk drying up and the impact of the medication she was forced to take in order to deal with the stress-induced seizures she suffers.

135.    Defendants' conduct often resulted in Plaintiff going to Defendants' medical unit crying in despair with panic attacks.

136.    In harassment, retaliation and discrimination against Plaintiff, Defendants on at least one occasion, stole her breast milk out of the company refrigerator, emptied the contents and placed the empty container on the table in an effort to threaten and intimidate Plaintiff.

137.    Defendants' conduct, behavior and treatment of Plaintiff, as set forth herein, did in fact result in Plaintiff being threatened and intimidated by their conduct.

138.    Prior to filing the Complaint, on an earlier occasion, Mr. Shamar Clemons told Plaintiff in front of Defendant Brittany Pryor and Mike, that he could give her a complaint form regarding the conduct and treatment she was receiving from Defendants, but that it would cause Ford's labor

relations department to "come down" on everyone. Defendant Brittany Pryor apologized but continued her discriminatory, harassing and retaliatory conduct as described herein.

139. On October 10, 2018, Plaintiff was harassed, threatened and discriminated against by Defendant Donald Wiggins as set forth in her Internal Complaint filed with Defendant Ford.

140. On or about November 24, 2018, ten or 15 minutes into her shift, Defendant Bob Fraogos, pulled Plaintiff off of her job on door line, ordered Mike K to send her home without reason or explanation, then cursed at Plaintiff telling her to "get the fuck out of his plant".

141. At that point Mike K questioned legitimacy of Defendant Fraogos order to remove Plaintiff from her job. Defendant Fraogos aggressively approached Plaintiff and questioned her as to who assigned her to work on his line (i.e. Door Line), although she had worked on that particular line a week prior.

142. When Plaintiff informed him who assigned her to the line, Defendant Fraogos responded to Mike K to "send her the fuck home."

143. Plaintiff's union challenged Defendant's right and authority to prematurely terminate Plaintiff's shift and Defendant relented.

144. Bob Fraogos told Plaintiff there were emails going around about her and that he did not want any "bull shit" from her while she worked on his crew.

145. This incident was in continuation of retaliation and discrimination against Defendant

146. On or about November 30, December 1 and December 2, 2018 Mike K, Supervisor on C Crew, continued the retaliation, harassment and discrimination against Plaintiff.

147. Over these three days Mike K repeatedly stood over Plaintiff's work area, monitoring her work in a harassing manner.

148. On November 30, 2018 Mike K removed Plaintiff from the door line, her assigned location, and forced her to work elsewhere.

149. On November 30, 2018 Plaintiff was disciplined by Mike K for being a "distraction to his line". Mike K informed Plaintiff that his production numbers have been down since she joined his line and that she was the cause of it.

150. When questioned by Plaintiff and her Union Representative, Mike K refused to, did not and could not provide a basis for his accusation against Plaintiff, thereby calling into question the legitimacy of his action and his motive for disciplining Plaintiff.

151.    When Plaintiff's Union Representative, Monty Walls, intervened Mike K threatened to hold onto the written discipline and only use it if at the end of the year Plaintiff had not "caused him any trouble."

152.    Plaintiff was "doubled up" on the job for which Mike K was disciplining her, thereby necessitating a discipline for her co-worker, Charlie, who was a Caucasian male.

153.    Moreover, Plaintiff job was to pick up Styrofoam boxes, weighing less than five pounds, and put them in to the production line and scan them.

154.    Any alleged failure of Plaintiff to properly complete her job had no impact on the production capacity of Defendant K's line, as he alleged.

155.    Instead, Defendant K was attempting to constructively or otherwise cause the termination of Plaintiff's employment under the guise of discipline.

156.    On or about December 1, 2018 Mike K issued a verbal discipline to Plaintiff and several co-worker for not having their safety glasses on, when, in fact, Plaintiff had her safety glasses on and the others did not.

157.    When Plaintiff questioned Mike K about the verbal discipline, which was harassing, retaliatory and discriminatory in nature, Defendant K "adjusted" his accusation and claimed to have seen Plaintiff without her

safety glasses on earlier and walked off without allowing Plaintiff to question or defend against his accusation.

158.     In continuation of his harassment, retaliation and discrimination against Plaintiff, on or about December 2, 2018, while Plaintiff's production line was down, Mike K approached Plaintiff and verbally warned her about having an ear phone in her ear.  Plaintiff pointed out that everyone else had ear phones on and that pursuant to company policy she only had one of the ear phones in her ear.

159.     In continuation of harassment, retaliation and discrimination against Plaintiff, she was ordered to a meeting on or about Friday, December 14, 2018, and threatened with termination by Defendant Kevin Drager for alleged absence and tardiness infractions and abuse, when in fact, there was no basis for such accusations.

160.     Moreover, at the meeting Defendant Drager inquired as to any discrimination being leveled against Plaintiff, feigning interest and support. However, when Plaintiff referred him to her recent complaint and inquired into the status of the investigation of her complaint, Defendant Drager commented that the "higher ups" did not want to continue the investigation of her complaint and it was therefore terminated.

161.    In further continuation of harassment, retaliation and discrimination against Plaintiff, Defendant ordered Plaintiff to engage in work without the proper safety equipment or protocols being followed. Specifically, Plaintiff was ordered to affix door stickers, in an elevated cage area over the production line without a safety harness or halting the production line. Plaintiff was told she had to do this dangerous job allegedly because fellow employees neglected to affix the door stickers.

162.    On or after February 2019, representatives from Defendant Ford came to Plaintiff's doctor's office and intimidating and threatening him to discontinue treating Plaintiff and seeking release of her medical records.

163.    In continuation of Defendant's illegal and discriminatory conduct towards Plaintiff, on or about March 15, 2019 Plaintiff was terminated from her job without prior warning, justification or explanation.

164.    Plaintiff's termination was in retaliation for complaints about the discriminatory conduct of Defendants as directed against Plaintiff and in continued harassment against Plaintiff because of her race, sex and complaint filed with the EEOC and internally with Defendant Ford.

165.    Plaintiff's termination was without justification and based on her sex, disability and race.

166.     Plaintiff filed a claim against Defendant Ford with the EEOC and was

subsequently harassed, intimidated, discriminated and retaliated against and

ultimately terminated from her employment, in response.

167.     Plaintiff was terminated by Defendant Ford based on her race and/or

gender.

168.     As a result of Defendants' actions and conduct, Plaintiff has

experienced multiple damages, including, at a minimum, memory problems,

seizures, distracted consciousness, having to write things down, short-term

memory loss, seizures, (including 7 within the span of a week).

169.     Plaintiff timely filed a charge with the Equal Employment

Opportunity Commission and brings this action within 90 days of receiving

her notice of right to sue.

## CLAIMS

### COUNT I
### VIOLATION OF TITLE VII
### CIVIL RIGHTS ACT OF 1964
### SEX DISCRIMINATION
(**As to Defendants Ford and Individual Defendants**)

170.     Plaintiff incorporates by reference the preceding paragraphs as fully

set forth herein.

171.    At all material times, Defendant Ford was an employer, covered by and within the meaning of Title VII of the Civil Rights Act of 1964 (Title VII), as amended.

172.    Plaintiff's sex was a factor that made a difference in Defendants' decision to subject her to the wrongful and discriminatory treatment described above.

173.    Defendant Ford, by its agents, representatives, and employees, was predisposed to discriminate on the basis of sex and acted in accordance with that predisposition.

174.    Defendants' actions were intentional, with reckless indifference to Plaintiff's rights and sensibilities.

175.    If Plaintiff had been a male, she would not have been treated in the manner described.

176.    As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits and has suffered mental anguish, physical and emotional distress, humiliation and embarrassment, and loss of professional reputation. PLAINTIFF REQUESTS that this court enter judgment against Defendants as follows:

1.    Legal relief

    a. a judgment for lost wages and benefits, past and future, in whatever amount she is found to be entitled;

    b. compensatory damages in whatever amount she is found to be entitled;

    c. punitive and exemplary damages commensurate with the wrong and Defendants' ability to pay; and

    d. an award of interest, costs, and reasonable attorney fees.

2. Equitable relief

    a. an order reinstating Plaintiff to the position she would have held if there had been no discrimination and retaliation by Defendants;

    b. an injunction prohibiting any further acts of retaliation or discrimination;

    c. an award of interest, costs, and reasonable attorney fees; and

    d. whatever other equitable relief appears appropriate at the time of trial.

## <u>COUNT II</u>

**VIOLATION OF TITLE VII**
**CIVIL RIGHTS ACT OF 1964**
**RACE DISCRIMINATION**
**(As to Defendants Ford and Individual Defendants)**

177.    Plaintiff incorporates by reference the preceding paragraphs as fully set forth herein.

178.    At all material times, Defendant Ford was an employer, covered by and within the meaning of Title VII of the Civil Rights Act of 1964 (Title VII), as amended.

179.    Plaintiff's race was a factor that made a difference in Defendants' decision to subject her to the wrongful and discriminatory treatment described above.

180.    Defendant Ford, by its agents, representatives, and employees, was predisposed to discriminate on the basis of race and acted in accordance with that predisposition.

181.    Defendants' actions were intentional, with reckless indifference to Plaintiff's rights and sensibilities.

182.    If Plaintiff had been white, she would not have been treated in the manner described.

183.    As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits and has suffered mental anguish, physical and emotional distress, humiliation and embarrassment, and loss of professional reputation.

PLAINTIFF REQUESTS that this court enter judgment against Defendants as follows:

1.    Legal relief

    a.  a judgment for lost wages and benefits, past and future, in whatever amount she is found to be entitled;

    b.  compensatory damages in whatever amount she is found to be entitled;

    c.   punitive and exemplary damages commensurate with the wrong and Defendants' ability to pay; and

    d.  an award of interest, costs, and reasonable attorney fees.

2.   Equitable relief

    a.  an order reinstating Plaintiff to the position she would have held if there had been no discrimination and retaliation by Defendants;

    b.  an injunction prohibiting any further acts of retaliation or discrimination;

    c.  an award of interest, costs, and reasonable attorney fees; and

    d.  whatever other equitable relief appears appropriate at the time of trial.

## COUNT III

## VIOLATION OF TITLE VII
## CIVIL RIGHTS ACT OF 1964

## RETALIATION
### (As to Defendants Ford and Individual Defendants)

184.     Plaintiff incorporates by reference the preceding paragraphs as fully

set forth herein.

185.     Defendants retaliated against Plaintiff for having complained about

Defendants' discriminatory employment practices described above, in

violation of Title VII.

186.     Defendants' actions were intentional, with reckless indifference to

Plaintiff's rights and sensibilities.

187.     As a direct and proximate result of Defendants' wrongful acts,

Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits

and has suffered mental anguish, physical and emotional distress,

humiliation and embarrassment, and loss of professional reputation.

PLAINTIFF REQUESTS that this court enter judgment against Defendants as

follows:

1.     Legal relief

a. a judgment for lost wages and benefits, past and future, in whatever

amount she is found to be entitled;

b. compensatory damages in whatever amount she is found to be

entitled;

    c.  punitive and exemplary damages commensurate with the wrong and Defendants' ability to pay; and

    d.  an award of interest, costs, and reasonable attorney fees.

2.  Equitable relief

    a.  an order reinstating Plaintiff to the position she would have held if there had been no discrimination and retaliation by Defendants;

    b.  an injunction prohibiting any further acts of retaliation or discrimination;

    c.  an award of interest, costs, and reasonable attorney fees; and

    d.  whatever other equitable relief appears appropriate at the time of trial.

<u>**COUNT IV**</u>

**VIOLATION OF TITLE VII**
**CIVIL RIGHTS ACT OF 1964**
**HOSTILE WORK ENVIRONMENT**
(**As to Defendants Ford and Individual Defendants**)

188.    Plaintiff incorporates by reference the preceding paragraphs as fully set forth herein.

189.    Defendants created, maintained and subjected Plaintiff to a hostile work environment, primarily, but not exclusively, for having complained

about Defendants' discriminatory employment practices described above, in violation of Title VII.

190. At all relevant times, Plaintiff was in a protected classification/group, being an African American, female and breast feeding.

191. Plaintiff was subjected to communications and/or conduct on the basis of sex, race and disability and but for the fact of her race, disability and sex, she would not have been the object of harassment.

192. Plaintiff was subjected to unwelcome sexual conduct and/or communications as set forth above.

193. The unwelcome sexual conduct and/or communication of Defendants was intended to, and in fact did, substantially interfere with Plaintiff's employment and created an intimidating, hostile, and offensive working environment.

194. As a direct and proximate result of Defendants' wrongful acts, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits and has suffered mental anguish, physical and emotional distress, humiliation and embarrassment, and loss of professional reputation.

PLAINTIFF REQUESTS that this court enter judgment against Defendants as follows:

1. Legal relief

    a.  a judgment for lost wages and benefits, past and future, in whatever amount she is found to be entitled;

    b.  compensatory damages in whatever amount she is found to be entitled;

    c.  punitive and exemplary damages commensurate with the wrong and Defendants' ability to pay; and

    d.  an award of interest, costs, and reasonable attorney fees.

3.  Equitable relief

    a.  an order reinstating Plaintiff to the position she would have held if there had been no discrimination and retaliation by Defendants;

    b.  an injunction prohibiting any further acts of retaliation or discrimination;

    c.  an award of interest, costs, and reasonable attorney fees; and

    d.  whatever other equitable relief appears appropriate at the time of trial.

## <u>COUNT V</u>

**VIOLATION OF MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT (MCL 37.2101 ET SEQ.) GENDER/SEX DISCRIMINATION and HARRASSMENT**
**(Hostile Work Environment)**

195.     Plaintiff incorporates by reference the preceding paragraphs as fully set forth herein.

196.     At all material times, Plaintiff was an employee, and Defendant Ford was her employer, covered by and within the meaning of the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq.

197.     Plaintiff was sexually harassed by Defendant Ford's agents and employees throughout the course of her employment.

198.     This sexual harassment has included, but is not limited to, unwelcome comments and conduct of an offensive and sexual nature directed at Plaintiff and the creation of a hostile work environment.

199.     The actions of Defendant Ford and its agents, representatives, and employees were intentional.

200.     The conduct of Defendant Ford's agents and employees in sexually harassing Plaintiff constitutes sexual discrimination in violation of MCL 37.2101 et seq.

201.     As a direct and proximate result of Defendants' unlawful actions against Plaintiff as described above, Plaintiff has suffered injuries and damages, including, but not limited to, potential loss of earnings and earning capacity; loss of career opportunities; loss of reputation and esteem in the

community; mental and emotional distress; and loss of the ordinary
pleasures of life.

PLAINTIFF REQUESTS that this court enter judgment against Defendants as
follows:

1.  Legal relief

    a.  compensatory damages in whatever amount above $25,000 Plaintiff is
        found to be entitled;

    b.  exemplary damages in whatever amount above $25,000 Plaintiff is
        found to be entitled;

    c.  judgment for the value of lost wages and benefits, past and future, in
        whatever amount above $25,000 Plaintiff is found to be entitled; and

    d.  an award of interest, costs, and reasonable attorney fees.

2.  Equitable relief

    a.  an order placing Plaintiff in the position she would have held had
        there been no discrimination;

    b.  an injunction prohibiting any further acts of discrimination;

    c.  an award of interest, costs, and reasonable attorney fees; and

    d.  whatever other equitable relief appears appropriate at the time of final
        judgment.

## COUNT VI

## VIOLATION OF MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT (MCL 37.2101 ET SEQ.)  RETALIATION

202.     Plaintiff incorporates by reference the preceding paragraphs as fully set forth herein.

203.     Plaintiff's filing of an internal claim against Defendant and with an outside agency constitutes activity protected under the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq.

204.     Defendant and its agents have retaliated against Plaintiff for complaining about discriminatory treatment, filing internal claims of discrimination and with an outside agency and for opposing violations of the Elliott-Larsen Civil Rights Act in violation of the act.

205.     As direct and proximate result of Defendants' unlawful actions against Plaintiff as described, Plaintiff has suffered injuries and damages, including, but not limited to, potential loss of earnings and earning capacity; loss of career opportunities; loss of reputation and esteem in the community; mental and emotional distress; and loss of the ordinary pleasures of life.

PLAINTIFF REQUESTS that this court enter judgment against Defendants as follows:

1.  Legal relief

a. compensatory damages in whatever amount above $25,000 Plaintiff is found to be entitled;

b. exemplary damages in whatever amount above $25,000 Plaintiff is found to be entitled;

c. judgment for the value of lost wages and benefits, past and future, in whatever amount above $25,000 Plaintiff is found to be entitled; and

d. an award of interest, costs, and reasonable attorney fees.

2. Equitable relief

a. an order placing Plaintiff in the position she would have held had there been no discrimination;

b. an injunction prohibiting any further acts of discrimination;

c. an award of interest, costs, and reasonable attorney fees; and

d. whatever other equitable relief appears appropriate at the time of final judgment.

## COUNT VII

## VIOLATION OF MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT (MCL 37.2101 ET SEQ.) RACE AND GENDER DISCRIMINATION

206. Plaintiff incorporates by reference the preceding paragraphs as fully set forth herein.

207.    At all material times, Plaintiff was an employee, and Defendant Ford was her employer, covered by and within the meaning of the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq.

208.    Plaintiff's race and gender were at least two factors that made a difference in Defendant's decision to terminate Plaintiff from her position.

209.    19. Had Plaintiff been white and/or male, she would not have been terminated.

210.    Defendant Ford, through its agents, representatives, and employees, was predisposed to discriminate on the basis of gender and race and acted in accordance with that predisposition.

211.    Defendant, through its agents, representatives, and employees, treated Plaintiff differently from similarly situated employees in the terms and conditions of employment, based on unlawful consideration of race and/or gender.

212.    Defendants' actions were intentional in disregard for Plaintiff's rights and sensibilities.

213.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of career opportunities; humiliation and embarrassment; mental and emotional distress; and loss of

the ordinary pleasures of everyday life, including the right to pursue gainful occupation of choice.

PLAINTIFF REQUESTS that this court enter judgment against Defendant as follows:

1. compensatory damages in whatever amount above $25,000 she is found to be entitled;

2. exemplary damages in whatever amount above $25,000 she is found to be entitled;

3. an award of lost wages and the value of fringe benefits, past and future;

4. an award of interest, costs, and reasonable attorney fees;

5. an order enjoining Defendant, its agents, representatives, and employees from further acts of discrimination or retaliation;

6. an order reinstating Plaintiff to the position she would have held if Defendant had not discriminated; and

7. an order awarding whatever other equitable relief appears appropriate at the time of final judgment.

## <u>COUNT VIII</u>

## **VIOLATION OF MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT (MCL 37.2101 ET SEQ.) PREGNANCY AND CHILDBIRTH RELATED**

214.    Plaintiff incorporates by reference the preceding paragraphs as fully set forth herein.

215.     At all material times, Plaintiff was an employee, and Defendant Ford was her employer, covered by and within the meaning of the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq.

216.     Plaintiff's pregnancy, childbirth related condition and gender were factors that made a difference in Defendant's decision to terminate Plaintiff from her position, deny her breast pumping and impose unreasonable and discriminatory conditions on her related to her pregnancy, as set forth above.

217.     Had Plaintiff been male and/or non-lactating she would not have been terminated nor treated in a discriminatory, harassing, and retaliatory manner by Defendants as set forth above.

218.     Defendant Ford, through its agents, representatives, and employees, was predisposed to discriminate, retaliate and harass on the basis of pregnancy and acted in accordance with that predisposition.

219.     Defendant, through its agents, representatives, and employees, treated Plaintiff differently from similarly situated employees in the terms and conditions of employment, based on unlawful consideration of pregnancy and childbirth related conditions.

220.     Defendants' actions were intentional in disregard for Plaintiff's rights and sensibilities.

221.    As a direct and proximate result of Defendants' unlawful actions, Plaintiff has sustained injuries and damages including, but not limited to, loss of earnings and earning capacity; loss of career opportunities; humiliation and embarrassment; mental and emotional distress; and loss of the ordinary pleasures of everyday life, including the right to pursue gainful occupation of choice.

PLAINTIFF REQUESTS that this court enter judgment against Defendant as follows:

1. compensatory damages in whatever amount above $25,000 she is found to be entitled;

2. exemplary damages in whatever amount above $25,000 she is found to be entitled;

3. an award of lost wages and the value of fringe benefits, past and future;

4. an award of interest, costs, and reasonable attorney fees;

5. an order enjoining Defendant, its agents, representatives, and employees from further acts of discrimination or retaliation;

6. an order reinstating Plaintiff to the position she would have held if Defendant had not discriminated; and

7. an order awarding whatever other equitable relief appears appropriate at the time of final judgment;

## COUNT IX

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (As to All Individual Defendants)

222.     Plaintiff incorporates by reference the preceding paragraphs as fully set forth herein.

223.     Defendants' conduct as outlined above was intentional.

224.     Defendants' conduct as outlined above was extreme, outrageous, and of such character as not to be tolerated by a civilized society.

225.     Defendants' conduct as outlined above was for an ulterior motive or purpose.

226.     Defendants' conduct resulted in severe and serious emotional distress.

227.     As a direct and proximate result of Defendants' conduct, Plaintiffs have been damaged in the manner outlined above, including but not limited to:

a.  loss of income and benefits;

b.  emotional distress;

c.  humiliation, mortification, and embarrassment;

d.  sleeplessness and anxiety; and

e.  other damages as they may become known through the course of

     discovery and the course of this trial.

Plaintiffs request the court to enter judgment in their favor against Defendant for

whatever amount Plaintiffs are found to be entitled, together with costs and

interest.

## JURY TRIAL DEMAND

Plaintiff hereby requests a jury trial in this case.


Respectfully submitted,

**HALL MAKLED, P.C.**

/s/Lamont D. Satchel
Cyril C. Hall (P29121)
Lamont D. Satchel (P52647)
Amir Makled (P76306)
Attorneys for Plaintiff
23756 Michigan Avenue, Ste. 300
Dearborn, Michigan 48124
(313) 788-8888 (Office)
(313) 582-7962 (Fax)


Dated: September 24, 2019